IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| DYLAN WEINSTEIN,<br>   Plaintiff<br><br>v.<br><br>NEW MEXICO JUNIOR COLLEGE, NEW MEXICO LAW ENFORCEMENT ACADEMY BOARD, AND WALTER COBURN (in his Individual and Official Capacities)<br><br>   Defendants. | Case No.:<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  COMES NOW Plaintiff Dylan Weinstein, by and through his attorneys of record, Bochner PLLC, and for his causes of action against New Mexico Junior College, New Mexico Law Enforcement Academy Board, and Walter Coburn, as follows:

## **PARTIES**

  1. Plaintiff Dylan Weinstein ("Weinstein") is a resident of Hobbs, New Mexico.

  2. Defendant New Mexico Law Enforcement Academy Board ("NMLEAB") is a political subdivision of the State of New Mexico charged with the certification of law enforcement officers in the state.

  3. Defendant Walter Coburn ("Coburn") was the duly appointed Director of The Southeastern New Mexico Law Enforcement Academy (the "Academy" or "SNMLEA") at all times pertinent to this matter. Upon information and belief, Coburn is currently domiciled at 1370 W Lynn St., Slaton, Texas 79364.

  4. Defendant Walter Coburn is sued in his individual capacity and in his former official capacity.

5. At all times pertinent hereto, Walter Coburn was employed by SNMLEA.

6. At all times pertinent hereto, Walter Coburn was acting in the course and scope of his employment, as a public employee, and under color of state law.

7. Defendant New Mexico Junior College ("NMJC") is the entity that houses and oversees SNMLEA. NMJC is located at 1 Thunderbird Cir., Hobbs, New Mexico 88240. Through its oversight and management of SNMLEA, NMJC is responsible for the actions that are the subject of this lawsuit.

8. At all times pertinent to this matter, NMJC was acting under color of state law.

9. Per the New Mexico Tort Claims Act, the appropriate state and local entities had actual notice of a potential civil claim as of May 15, 2024.

## JURISDICTION & VENUE

10. This case is based on acts or omissions that took place exclusively in Lea County, New Mexico.

11. This case involves allegations of various violations of Plaintiff's civil rights that are brought pursuant to 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343 and has jurisdiction over all state law claims in this action pursuant to 28 U.S.C. §1367, as all causes of action herein arise from the same transaction or occurrence and/or series of transactions or occurrences.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) since the incident in question occurred in Lea County, New Mexico.

## FACTUAL BACKGROUND

13. SNMLEA is one of several "satellite academies" that hosts training for future officers in the State of New Mexico.

14. SNMLEA offers two training and certification programs for new members of various jurisdictions and departments throughout the State of New Mexico. SNMLEA uses the campus and facilities of the New Mexico Junior College for instruction and training sessions in connection with its programs.

15. As part of the SNMLEA training programs, classes meet 48 hours a week, as required to satisfy the requirement that cadets complete at 674 training hours of basic training before they are eligible for final evaluation to become officers in the State of New Mexico.

16. Cadets who are enrolled in SNMLEA's programs live in dormitories on NMJC's campus for the duration of their program attendance.

17. As director of the Academy, Coburn was responsible for providing oversight and support for instructors and cadets. He was also responsible for consistently implementing the curriculum for police officer training and participated in the review of any misconduct cases that involved the Academy.

18. The Director of the SNMLEA also sits on the NM Law Enforcement Standards & Training Council, which holds regular meetings to carry out statutorily defined functions as set forth in the Law Enforcement Training Act, NMSA §29-7-1 through 29-7-16.

19. Coburn had a reputation for being hot-headed and quick to anger. For example, Coburn made a pattern of pointing to his service weapon and proclaiming that he would "shoot cadets on sight" if they bumped into him. Coburn would also publicly belittle and humiliate cadets for conduct he deemed unacceptable, including inflating minor transgressions into major issues.

20. Despite this reputation, Coburn regularly participated in training and instruction of cadets at SNMLEA. Coburn also participated in the discipline of cadets and instructors who

3

violated the rules of SNMLEA, and held significant authority over cadets, instructors, and curriculum at SNMLEA.

21. As part of the basic police training curriculum, cadets are required to complete training on (a) crisis management and intervention; (b) dealing with individuals who are experiencing mental health issues; (c) methods of de-escalation; (d) peer-to-peer intervention; (e) stress management; (f) racial sensitivity; (g) reality-based situational training; and (h) the use of force training that includes the elimination of vascular neck restraints. NM Stat § 29-7-4.4 (2023).

22. Under New Mexico law, attendance of a required training program for law enforcement officer "renders the [attending] person attending subject to the control of the New Mexico state police during attendance." N.M. Stat. § 29-2-16.

23. Weinstein began his training with SNMLEA on or around January 2024.

24. Weinstein graduated from SNMLEA's basic training program in or around May 2024 and now proudly serves his community as a member of the City of Hobbs Police Department.

25. Beginning in January 2024, Weinstein was an exemplary cadet in training at the Academy.

26. As part of his training, Weinstein was required to participate in reality-based situational training.

The Simulation

27. On May 14, 2024 at approximately 10:15pm, instructors at the Academy required several cadets, including Plaintiff, to complete "extra training" designed to mirror the various scenarios police officers could encounter during routine traffic stops (the "Simulation").

28. The Simulation was a live role-play exercise that imitated a scenario in which an officer stopped a vehicle after observing that the driver illegally failed to comply with a stop sign.

4

During role-play exercises such as the Simulation, cadets were typically assigned the role of "officers" while the Academy instructors portrayed the "suspects."

29. As part of the Simulation, Weinstein was assigned the role of primary officer, and another cadet was cast as Weinstein's "backup." The driver and passenger "suspects" were played by two Academy Instructors: Coburn and Eric McGee ("McGee," together with Coburn the "Mock Suspects"). A third instructor was assigned the role of "dispatch" to simulate a search for outstanding warrants.

30. At all times during the Simulation, Weinstein was dressed in standard training attire, including goggles and a mask meant to protect against flying projectiles. The Academy instructors did not request that Weinstein wear a helmet at any point before or during the Simulation, and did not inform Weinstein that there was any risk of head injury that could result from the Simulation.

31. As part of the Simulation, the Mock Suspects sat in a vehicle with tinted windows while Weinstein approached.

32. In keeping with officer safety protocols taught at the Academy, Weinstein knocked on the rear window of the vehicle as he approached. In response to Weinstein's knock, Coburn partially rolled down his window and loudly asked Weinstein why he had been pulled over.

33. In response to Coburn's question, Weinstein moved closer to the vehicle and requested that Coburn produce his license and registration. Coburn denied Weinstein's request and continued to speak in a hostile and aggressive manner towards Weinstein.

34. Following Coburn's denial of his request for identification, Weinstein asked Coburn for his name and date of birth. Coburn gave a mock name of "John Smith" which Weinstein then reported to the dispatch instructor. Weinstein also requested that the dispatch instructor search for any outstanding warrants for the mock name.

35. The third instructor searched Coburn's mock name for warrants, and informed Weinstein and his partner that there were no outstanding warrants for the mock name's arrest. In response to this new information, Weinstein approached the vehicle a second time, planning to issue a warning to the Coburn regarding his failure to stop at a stop sign, and then to allow the Suspects to go on with their evening.

36. As Weinstein approached the rear door of the vehicle for the second time, Coburn violently pushed the driver door open and bolted directly towards Weinstein. In response to Coburn's attack, Weinstein took several steps away from Coburn, drew his training weapon, and fired a blank round in Coburn's direction.

37. The Simulation was intended to mimic real-life circumstances, and so Weinstein assumed that the Simulation was over after he fired a blank round towards Coburn and Coburn exclaimed "you fucking shot me!"

38. There can be no doubt that in a real-life situation where an officer uses their firearm to shoot an attacker, the injured person will stop their pursuit or at a minimum, slow their attack on the officer. Though the Simulation was intended to mimic real-life circumstances and Coburn exclaimed that Weinstein had "shot" him, Coburn's pursuit of Weinstein did not slow.

39. To Weinstein's surprise, Coburn lunged at Weinstein and punched him in the head with significant force. Immediately after the initial impact, Weinstein bent over in agony while Coburn continued to pummel him, landing several additional blows and shouting "you are going to prison!" at Weinstein.

40. At no point did either of the other Academy instructors present during the Simulation intervene or attempt to stop Coburn.

6

41. At no point did either of the Academy instructors present during the Simulation verbally inform Coburn that his behavior was inappropriate.

42. Weinstein was understandably shocked by Coburn's continued attack, especially in view of his belief that the Simulation had ended when he had "shot" Coburn.

43. Weinstein's classmates were similarly shocked by Coburn's attack on Weinstein. Though grappling and physical contact are expected components of police training, members of Weinstein's cohort were visibly shocked by the fact that Coburn had brazenly attacked Weinstein (1) after the Simulation had ended, and (2) in a manner that was far outside the scope of typical physical contact training.

44. After Coburn's attack, Weinstein was curtly instructed to re-join his classmates.

45. Following Coburn's attack, Weinstein returned to his dormitory and told his roommate that he was experiencing several new symptoms including blurred vision in his left eye and a severe headache.

46. Fearing expulsion from the Academy and ineligibility to serve his community as a law enforcement officer, Weinstein did not ask for medical attention to treat these new symptoms, and went to bed with the hope that he would be at least partially recovered by the next morning.

47. On May 15, 2024, Weinstein awoke with continued blurred vision in his left eye and a persisting severe headache. Later that morning, Coburn requested that Weinstein meet with him in his office.

48. Weinstein arrived in Coburn's office to find an audience of other Academy instructors had been assembled. Once Weinstein arrived, Coburn harshly and sarcastically harangued Weinstein into writing an apology letter to the fictitious family of "John Smith" for the

injuries suffered by Coburn's character during the Simulation. Weinstein accepted Coburn's instruction, and Coburn dismissed him back to the classroom.

49. At no point did Coburn verbally acknowledge the fact that he had brutally assaulted Weinstein. Further, Coburn did not inquire as to Weinstein's health or give him the opportunity to voice any concerns regarding the Simulation. Rather, Coburn used his position of authority to feed his ego, demanding that Weinstein write and submit a mock letter for "injuries" suffered by his character.

Weinstein Seeks Medical Treatment

50. Weinstein followed Coburn's instructions and returned to his regularly scheduled classes. However, shortly thereafter, Weinstein's pain and blurred vision became so acute that they rendered him unable to participate in class. At this point, Weinstein decided to seek medical treatment, first with the on-campus medical personnel at NMJC. Weinstein requested that Jeff Moyers, his classroom instructor at the time, escort him to NMJC's medical treatment facility. But, Moyers declined and informed Weinstein that Coburn would take him instead.

51. That same day, Coburn shuttled Weinstein via golf cart to the Academy's medical office. During their ride, Coburn asked Weinstein if "he had a headache or something?" Weinstein answered that he did have a headache, and further informed Coburn that his symptoms were far beyond a typical headache.

52. Coburn then asked if "this is the result of the incident?" to which Weinstein answered "yes, sir." The remainder of the two-minute golf cart ride was silent. Weinstein did not request that Coburn accompany him inside the NMJC medical center, especially since he was seeking treatment for injuries that Coburn unilaterally caused.

8

53. When Weinstein and Coburn arrived at the NMJC medical center, Weinstein spoke with an intake receptionist while Coburn sat in the waiting room. As Weinstein was having a conversation with NMJC's medical staff, Coburn approached Weinstein, handed him a business card, and instructed Weinstein to notify him when he was released, offering to collect him from the medical offices if no other instructors were available. Coburn then left the NMJC medical center.

54. After Coburn departed, an intake nurse measured Weinstein's vitals and asked about the cause of his symptoms. After Weinstein recounted the Simulation and Coburn's attack, the nurse seemed visibly disturbed that a school instructor had engaged in such aggressive conduct towards a student, even suggesting that Weinstein "sue the school."

55. The intake nurse departed, and a nurse practitioner entered Weinstein's exam room to perform a series of eye tests. The nurse practitioner evaluated the results of the eye tests and expressed her concern to Weinstein about his symptoms. She recommended that Weinstein go to the emergency room for further testing including CT scans of his head.

56. After Weinstein was examined by NMJC's nurse practitioner, Weinstein's direct supervisor at the Hobbs Police Department Sgt. Matt Burleson ("Burleson") asked to see Weinstein and drove him to the nearest hospital.

57. Once at the hospital, Weinstein was evaluated by a doctor and underwent a CT scan as recommended by the NMJC nurse practitioner. Weinstein's doctor told him that the CT scan results did not evidence brain bleeding and discharged Weinstein from his care.

58. After being discharged from the hospital, Burleson drove Weinstein directly to the Hobbs Police Department, where Weinstein was required to complete internal paperwork detailing the incident at the SNMLEA. Several ranking officers including the Chief of Police August Fons

and Lieutenant Jason Herrera interacted with Weinstein during his visit to the Hobbs Police Department, all expressing concern for Weinstein's health. After Weinstein had completed the department paperwork, Burleson drove Weinstein back to the Academy, where Weinstein expected to return to his training.

59. To Weinstein's surprise, SNMLEA Instructors informed him that he would not be permitted to resume Academy activities until he was medically cleared to do so. Burleson then drove Weinstein to a local clinic where he was seen by a nurse practitioner, who cleared him to return to the Academy. Burleson then drove Weinstein back to the Academy where he was able to resume his classes.

60. Despite the incident, Weinstein completed the remainder of his mandatory training, earned strong grades, and graduated on time with the rest of his cohort.

The Aftermath

61. On information and belief, SNMLEA conducted an internal investigation into Coburn's conduct and Weinstein's injuries arising from the same.

62. As director of SNMLEA, Coburn was obligated to provide updates on significant events (including the incident described herein) to the New Mexico Law Enforcement Standards and Training Council (NMLESTC) on at least a monthly basis.

63. In either event, Weinstein was entitled to receive an update on the status of any investigation into the incident.

64. Weinstein has received no updates regarding any internal investigation from SNMLEA, or from any other board, commission, committee, council, or affiliates of the New Mexico State Police.

65. Weinstein suffered severe and permanent injuries as a direct and proximate result of Coburn's attack.

66. In addition to the paperwork submitted by Weinstein recounting Coburn's conduct, several other Academy cadets witnessed Coburn's attack on Weinstein and submitted statements detailing their observations. As of the date of this filing, Weinstein has been denied access to those statements.

67. On information and belief, a meeting of the SNMLEA instructors was called to discuss and align their accounts of Coburn's attack.

68. On information and belief, Coburn used his position as director of SNMLEA to coerce other SNMLEA instructors in his employ to modify their accounts of his attack on Weinstein.

69. Following the incident, Coburn was put on administrative leave by NMJC and ultimately resigned from his position as director of SNMLEA.

70. New Mexico law authorizes the removal of a law enforcement officer's commission when an officer demonstrates "incompetence, neglect of duty, violat[es] of a published rule of conduct, [or commits] malfeasance in office or conduct unbecoming an officer. " N.M. Stat. § 29-2-11.

71. By and through their refusal to remove Coburn's commission as a law enforcement officer of the state of New Mexico, Defendants have caused and continue to cause damages to Plaintiff.

72. Weinstein has suffered a violation of his U.S. and state constitutional rights as a direct and proximate result of NMJC's refusal to appropriately discipline Coburn.

73. Weinstein now brings this suit to recover from the severe and permanent damages he suffered as a result of the above conduct.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983

74. Plaintiff hereby incorporates each and every foregoing and following paragraph of the Complaint as if fully set forth herein.

75. Coburn was at all times pertinent hereto acting under color of state law.

76. The Fourth Amendment of the U.S. Constitution guarantees Weinstein the right to be free from unreasonable seizures, including shows of unjustified, brutal, and excessive force by state authorities.

77. By and through the conduct described above, Coburn deprived Weinstein of his constitutionally protected rights while he was under the control of the Academy. Specifically, Coburn's attack on Weinstein, who posed no threat to Coburn and was earnestly engaging in a simulated training exercise, was an unjustified use of brutal and excessive force.

78. As a police academy instructor with many years' experience training new peace officers, Coburn certainly knew that his attacking Weinstein was inappropriate and fell far outside the meets and bounds of acceptable situational training.

79. Coburn's attack on Weinstein was objectively unreasonable.

80. Coburn's assault violated Weinstein's rights to bodily integrity and safety from wanton violence as secured by the Fourth Amendment and in direct violation of 42 U.S.C. § 1983.

81. Therefore, Coburn's violations of Weinstein's rights were willful, wanton, and undertaken for the purpose of denying Weinstein equal protection of the laws of New Mexico and the United States.

82. Defendant Coburn's use of force violated Plaintiff's rights under the Fourth Amendment to the United States Constitution and the New Mexico Constitution.

83. The use of force against Plaintiff was excessive and objectively unreasonable under the circumstances.

84. Defendant Coburn's battery and assault of Plaintiff was objectively unreasonable, as well as willful, intentional, wanton, obdurate and in gross and reckless disregard for Plaintiff's rights.

85. As a direct and proximate result of Defendant Coburn's conduct set forth in this Complaint, Plaintiff has suffered damages, including at least physical compensatory damages, pain and suffering, and reputational harm.

**COUNT II: VIOLATION OF ARTICLE II, SECTION 18 OF THE NEW MEXICO STATE CONSTIUTION UNDER THE NEW MEXICO CIVIL RIGHTS ACT**

86. Plaintiff hereby incorporates each and every foregoing and following paragraph of the Complaint as if fully set forth herein.

87. Article II, Section 10 of the New Mexico State Constitution guarantees Weinstein the right to be free from unreasonable seizures.

88. This includes all seizures of a person involving unjustified, brutal, and excessive force.

89. By and through the conduct described above, Coburn deprived Weinstein of his protected rights while he was under the control of the Academy. Specifically, Coburn's attack on

Weinstein, who posed no threat to Coburn and was earnestly engaging in a simulated training exercise, was an unjustified use of brutal and excessive force.

90. As a police academy instructor with many years' experience training new peace officers, Coburn certainly knew that his attacking Weinstein was inappropriate and fell far outside the meets and bounds of acceptable situational training.

91. Coburn's attack on Weinstein was objectively unreasonable.

92. Coburn's assault violated Weinstein's rights to bodily integrity and safety from wanton violence as secured by the Fourth Amendment and in direct violation of 42 U.S.C. § 1983.

93. Therefore, Coburn's violations of Weinstein's rights were willful, wanton, and undertaken for the purpose of denying Weinstein equal protection of the laws of New Mexico and the United States.

94. Defendant Coburn's use of force violated Plaintiff's rights under the Fourth Amendment to the United States Constitution and the New Mexico Constitution.

95. The use of force against Plaintiff was excessive and objectively unreasonable under the circumstances.

96. Defendant Coburn's battery and assault of Plaintiff was objectively unreasonable, as well as willful, intentional, wanton, obdurate and in gross and reckless disregard for Plaintiff's rights.

97. As a direct and proximate result of Defendant Coburn's conduct set forth in this Complaint, Plaintiff has suffered damages, including at least physical compensatory damages, pain and suffering, and reputational harm.

## COUNT III: TORT CLAIM- ASSAULT

98. Plaintiff hereby incorporates each and every foregoing and following paragraph of the Complaint as if fully set forth herein.

99. Under New Mexico law, assault is defined as there being an act, threat, or menacing conduct which causes another person to reasonably believe that he is in danger of receiving a battery. *Baca v. Velez*, 833 P.2d 1194 (1992).

100. Even though Weinstein believed that the Simulation had ended, Coburn rapidly approached Weinstein while waving his fists, causing Weinstein to apprehend that a harmful of offensive contact was imminent.

101. Weinsteins belief was certainly reasonable in light of the fact that he was, indeed attacked and harmed by Coburn.

102. As a result of Coburn's assault, Weinstein has suffered significant damages.

## COUNT IV: TORT CLAIM- BATTERY

103. Plaintiff hereby incorporates each and every foregoing and following paragraph of the Complaint as if fully set forth herein.

104. Coburn acted with intent to cause a harmful or offensive contact with Plaintiff when he attacked Weinstein after he was "shot" during a training exercise.

105. Indeed, Coburn made harmful or offensive contact with Plaintiff when he attacked Weinstein.

106. Coburn's conduct was clearly no accident. Indeed, Coburn left a seated position in a car, crossed the threshold between himself and Weinstein that was made larger by Weinstein's retreat, and repeatedly struck Weinstein with his fists.

107. Weinstein suffered significant injuries as a result of Coburn's attack, including the physical symptoms of severe headaches and blurred vision, the emotional distress of suffering an attack by an instructor, the emotional distress of facing expulsion from the Academy should his injuries disqualify him from continued training, and risk to his anticipated career as a law enforcement officer.

**COUNT V: TORT CLAIM- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

108. Plaintiff hereby incorporates each and every foregoing and following paragraph of the Complaint as if fully set forth herein.

109. Defendant Coburn acted outside the scope and authority of his employment when he attacked Weinstein.

110. Defendant Coburn's actions were intentional, shocking, and exceeded the bounds of acceptable or commonly decent behavior.

111. In addition to physical harms, Weinstein suffered significant emotional distress as a result of Coburn's attach since the injuries sustained in the attack jeopardized Weinstein's career prospects. The attack and injuries suffered by Weinstein threatened his ability to complete the training required to become a law enforcement officer.

112. Additionally, Coburn's summoning Weinstein to his office for a full remand in front of the other SNMLEA instructors caused Weinstein to suffer significant emotional distress.

113. Since Defendant Coburn's attack, Weinstein has suffered and continues to suffer damages including those related to medical bills incurred, pain and suffering, and emotional distress as a result of the conduct described herein.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for judgment against Defendants as follows:

(a) Compensatory damages in an amount to be determined at trial;

(b) Consequential damages flowing from the incident including past and future medical expenses;

(c) Punitive damages for Defendants' willful deprivations of Plaintiff's constitutional rights in an amount to be determined at trial,

(d) Damages arising out of past pain and suffering in an amount to be determined at trial;

(e) Damages arising out of future pain and suffering in an amount to be determined at trial;

(f) Damages for emotional distress in an amount to be determined at trial;

(g) The costs of this action including but not limited to attorneys' fees;

(h) Pre-judgment and post-judgment interest; and

(i) For such other and further relief as the Court may deem to be just and appropriate.

Dated: December 17, 2024

*/s/ Serge Krimnus*
Serge Krimnus, Esq.
Edward A. Paltzik, Esq.
Meredith Lloyd, Esq.
Bochner PLLC
1040 Avenue of the Americas, 15th Floor
New York, NY 10018
Telephone: (646) 971-0685

        Email: serge@bochner.law
        edward@bochner.law
        meredith@bochner.law


*Attorneys for Plaintiff*